| UNITED STATES DISTRICT COURT | EASTERN DISTRICT OF TEXAS |
|---|---|

| UNITED STATES OF AMERICA | § | |
|---|---|---|
| | § | |
| *versus* | § | CASE NO. 4:14-CR-28 (20) |
| | § | |
| MICHAEL SEAN MOUNT | § | |

**MEMORANDUM AND ORDER**

Pending before the court is Defendant Michael Sean Mount's ("Mount") *pro se* Motion for Sentence Modification (#985) pursuant to 18 U.S.C. § 3582(c)(1)(A), wherein Mount seeks a reduction of his sentence to time served due to the threat of Coronavirus Disease 2019 ("COVID-19"). The Government filed a response in opposition (#991). United States Probation and Pretrial Services ("Probation") conducted an investigation and recommends that the court deny the motion. Having considered the motion, the Government's response, Probation's recommendation, the submissions of the parties, the record, and the applicable law, the court is of the opinion that the motion should be denied.

I.   Background

On May 14, 2014, a Grand Jury for the Eastern District of Texas returned a Second Superseding Indictment charging Mount and 22 codefendants in Count 1 with Conspiracy to Possess with Intent to Manufacture and Distribute 500 Grams or More of a Mixture or Substance Containing a Detectable Amount of Methamphetamine or 50 Grams or More of Methamphetamine (Actual), in violation of 21 U.S.C. § 846. On May 4, 2016, Mount pleaded guilty pursuant to a binding plea agreement to Count 1 of the Second Superseding Indictment. On October 5, 2016, the court sentenced Mount to 188 months' imprisonment, followed by a 5-year term of supervised

release.  Mount is currently housed at Federal Correctional Institution Big Spring, located in Big Spring, Texas ("FCI Big Spring").  Mount's projected release date is October 3, 2027.

II.  Analysis

    A.  Exhaustion

On December 21, 2018, President Trump signed the First Step Act of 2018 into law.  *See* First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194.  The Act, in part, amended 18 U.S.C. § 3582(c), which gives the court discretion, in certain circumstances, to reduce a defendant's term of imprisonment:

> The court, upon motion of the Director of the Bureau of Prisons ("BOP"), or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that extraordinary and compelling reasons warrant such a reduction; or the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [BOP] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g); and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A).  This provision is commonly referred to as "compassionate release."

Prior to the First Step Act, only the Director of the BOP could file a motion seeking compassionate release.  *See United States v. Franco*, 973 F.3d 465, 467 (5th Cir. 2020) ("Prior to the passage of the First Step Act . . . courts lacked the power to adjudicate motions for compassionate release."); *Tuozzo v. Shartle*, No. 13-4897, 2014 WL 806450, at *2 (D.N.J. Feb. 27, 2014) (denying petitioner's motion for compassionate release because no motion for his release

was filed by the BOP).  The First Step Act amended § 3582(c) by providing a defendant the means to appeal the BOP's decision not to file a motion for compassionate release on the defendant's behalf.  *United States v. Cantu*, 423 F. Supp. 3d 345, 347 (S.D. Tex. 2019); *United States v. Bell*, No. 3:93-CR-302-M, 2019 WL 1531859, at *1 (N.D. Tex. Apr. 9, 2019).  The plain language of the statute, however, makes it clear that the court may not grant a defendant's motion for compassionate release unless the defendant has complied with the administrative exhaustion requirement.  18 U.S.C. § 3582(c)(1)(A); *Franco*, 973 F.3d at 467 (holding that the statutory requirement that a defendant file a request with the BOP before filing a motion for compassionate release in federal court "is *not* jurisdictional but that it *is* mandatory"); *United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020) ("Even though [the] exhaustion requirement does not implicate [the court's] subject-matter jurisdiction, it remains a mandatory condition."); *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he exhaustion requirement . . . presents a glaring roadblock foreclosing compassionate release.").  Thus, before seeking relief from the court, a defendant must first submit a request to the warden of his facility to move for compassionate release on his behalf and then either exhaust his administrative remedies or wait for the lapse of 30 days after the warden received the request.  18 U.S.C. § 3582(c)(1)(A); *Franco*, 973 F.3d at 467 ("The text . . . outlines two routes a defendant's motion can follow to be properly before the court.  Both routes begin with the defendant requesting that 'the [BOP]' 'bring a motion on the defendant's behalf.'"); *United States v. Harris*, 812 F. App'x 106, 107 (3d Cir. 2020); *United States v. Springer*, 820 F. App'x 788, 791 (10th Cir. 2020) (defendant "was required to request that the BOP file a compassionate-release motion on his behalf to initiate his administrative remedies" (citing *Raia*, 954 F.3d at 595)); *Alam*, 960 F.3d at 833-34; *United States v. Soliz*, No.

2:16-190-3, 2020 WL 2500127, at *3 (S.D. Tex. May 14, 2020) ("§ 3582(c)(1)(A) does not provide this Court with the equitable authority to excuse [defendant's] failure to exhaust his administrative remedies or to waive the 30-day waiting period." (quoting *United States v. Reeves*, No. 18-00294, 2020 WL 1816496, at *2 (W.D. La. Apr. 9, 2020)))).

Here, Mount complied with the exhaustion requirement before filing the instant motion. Attached to Mount's motion is his July 17, 2020, request for compassionate release. Additionally, attached to the Government's response is Mount's apparent second request to the warden of the facility where he is housed, dated July 26, 2020, seeking compassionate release on the same basis as his July 17, 2020, request. Mount's compassionate release request to Warden R. Marques relied up his medical conditions as well as his desire to care for his 79-year-old father and to provide financial support and be a good role model for his four children.[4] Also attached to the Government's response is a denial letter from Warden Marques, dated December 7, 2020. The denial letter states that Mount's concerns about COVID-19 do not warrant early release at this time. Although Mount satisfied the exhaustion requirement, nothing in his motion indicates that extraordinary and compelling reasons exist to reduce his sentence.

Congress did not define "extraordinary and compelling." Rather, it elected to delegate its authority to the United States Sentencing Commission ("the Commission"). *See* 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be

---

[4] As of the date of this order, Mount has claimed having at least five children. In Mount's motion to the court, he states that he has "5 adorable children," but in his request to Warden Marques, he maintains that his "4 children" need him to be a positive role model. Curiously, Mount's Presentence Investigation Report ("PSR"), prepared on August 3, 2016, indicates that he has three minor children ages 10, 10, and 3. According to his PSR, Mount was arrested on May 29, 2014, and he has been detained since that time. Thus, it is unclear to the court exactly how many children Mount has fathered or claims.

considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."); *see also* U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 (U.S. SENTENCING COMM'N 2018) ("USSG").  In Application Note 1 to § 1B1.13 of the USSG, the Commission defined "extraordinary and compelling reasons" to include the following four categories of circumstances:  (i) certain medical conditions of the defendant; (ii) the defendant is 65 years or older and meets other requirements; (iii) the defendant's family has specified needs for a caregiver; and (iv) other reasons in the defendant's case that establish an extraordinary and compelling reason.  The court must also consider the factors set forth in 18 U.S.C. § 3553(a),[1] as applicable, and find that the sentence modification is consistent with the policy statements issued by the Commission.  18 U.S.C § 3582(c)(1)(A).  The policy statement regarding compassionate release requires a determination that "the defendant is not a danger to the safety of any other person or to the community."  U.S.S.G. § 1B1.13(2).

B.      Medical Conditions

As grounds for relief set forth in his motion, Mount, age 53, asserts that his underlying health conditions establish extraordinary and compelling reasons to grant him compassionate release.  He claims that his medical conditions include:  high blood pressure, complications from wedged discs in his back, an enlarged heart that is malformed on the right side, and major

---

[1] Section 3553(a) directs courts to consider:  the nature and circumstances of the offense and the defendant's history and characteristics; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need to deter criminal conduct; the need to protect the public; the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences and sentencing ranges established for defendants with similar characteristics under applicable USSG provisions and policy statements; any pertinent policy statement of the Commission in effect on the date of sentencing; the need to avoid unwarranted disparities among similar defendants; and the need to provide restitution to the victim.  18 U.S.C. § 3553(a).

degenerative osteoarthritis involving the radion vicular joint in his right wrist. As supporting evidence, Mount attaches a single page of medical documentation. The Government, however, has supplied Mount's complete 2020 BOP medical records. The USSG provides that extraordinary and compelling reasons exist regarding a defendant's medical condition when the defendant is "suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory)" or when a defendant is "suffering from a serious physical or medical condition," "suffering from a serious functional or cognitive impairment," or "experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 cmt. n.1(A).

    A review of Mount's PSR, prepared in 2016, reveals that when Probation inquired about his physical condition, Mount replied that he "has nerve damage from illicit drug use and the illegal use of prescription medications and has had arthritis for the last two years." Additionally, Mount reported that he suffered from "chronic high blood pressure for 10 years and is prescribed medication for the condition." Mount's BOP medical records include several pages entitled Health Problems, generated on December 21, 2020, that list the following "current" medical conditions: stimulant related disorders (severe—amphetamine type substance), myopia, presbyopia, unspecified visual disturbance, essential (primary) hypertension, disease of hard tissues of teeth, gingival recession, partial loss of teeth, gastro-esophageal reflux disease without esophagitis, other specified arthritis (right wrist/knee), low back pain, enlarged prostate with lower urinary tract symptoms, other specified symptoms and signs involving the digestive system and abdomen,

sprain of shoulder joint, encounter for fit/adjustment of dental prosthetic device, and presence of dental prosthetic device.

None of these medical conditions is terminal or substantially diminishes his ability to provide self-care. *See United States v. Thompson*, ___F.3d___, No. 20-40381, 2021 WL 37493, at *2 (5th Cir. Jan. 5, 2021). To the contrary, Mount's conditions are all managed with medication. *See id*. Mount's medical records reflect that he is prescribed a variety of medications to treat and/or manage his health problems including: Finasteride and Tamsulosin for his prostate/urinary problems, Hydrochlorothiazide, Lisinopril, and Metoprolol Tartrate to treat his high blood pressure, Omeprazole to control his gastro-esophageal reflex, and Oxcarbazepine and Ibuprofen for pain management. Additionally, Mount's records note that he "can walk 2 miles," thus indicating that Mount is ambulatory and capable of providing self-care. Clearly, Mount's hypertension, from which he claims to have suffered since at least 2006, did not hamper or prevent him from committing a series of crimes, including his offense of conviction. Probation further points out, as confirmed by BOP records, that Mount is classified as a medical Care Level 2 inmate (stable, chronic care), indicating that he has "simple chronic health issues that can be managed by BOP medical staff."[2] Moreover, BOP records dated December 21, 2020, indicate that Mount is housed in general population, has no medical restrictions, has regular duty work assignments, is cleared for food service, and is currently a "sunset orderly."

---

[2] The BOP characterizes medical Care Level 2 inmates as follows: Care Level 2 inmates are stable outpatients who require clinician evaluations monthly to every 6 months. Their medical conditions can be managed through routine, regularly scheduled appointments with clinicians for monitoring. Enhanced medical resources, such as consultation or evaluation by medical specialists, may be required from time to time.

Thus, Mount's medical conditions do not meet the criteria for compassionate release listed in the guidelines.  While some of Mount's underlying medical conditions, according to the Centers for Disease Control and Prevention ("CDC") website, may place him at a higher risk of severe symptoms should he contract COVID-19, such commonplace maladies do not make Mount's case "extraordinary."  *Id.* (noting that "nearly half of the adult population in the United States suffers from hypertension").  Furthermore, despite potentially being at higher risk of severe COVID-19 symptoms, it appears from Mount's medical records that he previously contracted COVID-19, but he was asymptomatic.  The Government also comments in its response that Mount "endured COVID-19 without complications."

Therefore, Mount has failed to establish that a qualifying medical condition exists that would constitute extraordinary and compelling reasons to reduce his sentence.  Further, "compassionate release is discretionary, not mandatory, and [may] be refused after weighing the sentencing factors of 18 U.S.C. § 3553(a)."  *United States v. Chambliss*, 948 F.3d 691, 693 (5th Cir. 2020).  Where, as here, a prisoner has engaged in "severe" criminal conduct and has an extensive criminal history, the district court has discretion to deny compassionate release after weighing the evidence.  *Id.* at 693-94.

C.     Family Circumstances

In his request for compassionate release to Warden Marques, Mount references the need to care for his 79-year-old father who is in "desperate need of home care" and his "need to be [a] breadwinner, support and a father to [his] children, who need a positive role model."  Although the USSG acknowledges that extraordinary and compelling reasons may exist with respect to a defendant's family circumstances, it specifies the following qualifying conditions:  (i) "[t]he death

or incapacitation of the caregiver of the defendant's minor child or minor children" or (ii) "[t]he incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner." U.S.S.G. § 1B1.13 cmt. n.1(C)(i)-(ii). In this instance, Mount's desire to support his children financially and to be a good role model does not satisfy either of these conditions. *See United States v. Envert Francisco-Ovalle*, No. 18-CR-526 (AJN), 2021 WL 123366, at *3 (S.D.N.Y. Jan. 13, 2021) ("Defendant's desire to provide financial support for his family, while . . . admirable, applies broadly to incarcerated persons and does not in itself provide extraordinary and compelling reasons justifying release."). Further, Mount does not claim that his children's primary caregivers are deceased or incapacitated. Moreover, according to his PSR, Mount is single and has never been married. Therefore, Mount cannot claim he is the only available caregiver for a spouse or registered partner.

Mount also cites the desire to care for his ailing father. This falls outside the scope of USSG § 1B1.13 cmt. n.1(C), which applies only to minor children and registered partners. *See United States v. Jenkins*, No. CR 6:03-50, 2020 WL 5984401, at *3 (S.D. Tex. Oct. 6, 2020) (noting that "caring for a sick and/or aging parent is not a qualifying 'family circumstance' under U.S.S.G. § 1B1.13(1)(A)."); *United States v. Johnson*, No. 2:13-231, 2020 WL 3000500, at *2 (S.D. Tex. June 2, 2020) (holding unless the elderly parent is the caregiver of defendant's own minor children, an elderly parent is not covered under USSG § 1B1.13); *United States v. Goldberg*, No. CR 12-180 (BAH), 2020 WL 1853298, at *4 (D.D.C. Apr. 13, 2020) (noting that a desire to care for one's elderly parents does not constitute an extraordinary and compelling reason because "[m]any, if not all inmates, have aging and sick parents." (quoting *United States*

9

*v. Ingram*, No. 2:14-cr-40, 2019 WL 3162305, at *2 (S.D. Ohio July 16, 2019))); *United States v. Gonzales*, No. SA-05-CR-561-XR, 2019 WL 5102742, at *3 (W.D. Tex. Oct. 10, 2019) (movant's desire to help his adult daughter and her mother and to become a caregiver for his elderly mother and mentally challenged sister do not present the type of "familial relations . . . covered by the Application Notes 1(C) or 1(D) to U.S.S.G. § 1B1.13."). Hence, Mount fails to meet the requirements for family circumstances that establish extraordinary and compelling reasons for early release from prison.

D.   Other Reasons

Mount's request for compassionate release potentially falls into the fourth, catch-all category of "other" extraordinary and compelling reasons, which specifically states that the Director of the BOP shall determine whether "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 cmt. n.1(D). Although Subdivision D is reserved to the BOP Director, the Commission acknowledged, even before the passage of the First Step Act, that courts are in the position to determine whether extraordinary and compelling circumstances are present. *United States v. Beck*, 425 F. Supp. 3d 573, 583 (M.D.N.C. 2019) ("Read in light of the First Step Act, it is consistent with the previous policy statement and with the Commission guidance more generally for courts to exercise similar discretion as that previously reserved to the BOP Director in evaluating motions by defendants for compassionate release."); *see Cantu*, 423 F. Supp. 3d at 352 ("[T]he correct interpretation of § 3582(c)(1)(A) . . . is that when a defendant brings a motion for a sentence reduction under the amended provision, the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G.

§ 1B1.13 cmt. n.1(A)-(C) warrant granting relief."). Here, there is no indication that the BOP Director made a determination regarding the presence of extraordinary and compelling reasons with respect to Mount for any "other" reason. In exercising its discretion, the court, likewise, finds that no extraordinary and compelling reasons exist in relation to Mount's situation.

Mount expresses concerns regarding the spread of COVID-19 among the prison population. Nevertheless, as of January 18, 2021, the figures available at www.bop.gov list 1 inmate (out of a total inmate population of 984) and 10 staff members at FCI Big Spring as having confirmed positive cases of COVID-19, 791 inmates and 0 staff members who have recovered, and 3 inmates who have succumbed to the disease. Thus, it appears that the facility where Mount is housed is handling the outbreak appropriately and providing adequate medical care.

Although Mount expresses legitimate concerns regarding COVID-19, he does not establish that the BOP cannot manage the outbreak within his correctional facility or that the facility is specifically unable to treat Mount, if he were to contract the virus once again and develop COVID-19 symptoms, while incarcerated. *See Thompson*, 2021 WL 37493, at *3 ("Fear of COVID doesn't automatically entitle a prisoner to release."); *Raia*, 954 F.3d at 597 ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."); *United States v. Banks*, No. CR 15-0080-02, 2020 WL 6839267, at *4 (W.D. La. Nov. 20, 2020) ("This Court cannot equate the generalized fear of COVID-19 to an extraordinary and compelling reason to support compassionate release, nor will it undermine BOP's criteria to determine eligibility for sentence reductions or home confinement."); *United States v. Woods*, No. 4:11-CR-106-SDJ, 2020 WL

11

6391591, at *4 (E.D. Tex. Nov. 2, 2020) (noting that "courts have concluded that an inmate's concerns about risks associated with the spread of COVID-19 are not consistent with the policy statement of the Commission as required by Section 3582(c)(1)(A)"); *United States v. Vasquez*, No. CR 2:18-1282-S-1, 2020 WL 3000709, at *3 (S.D. Tex. June 2, 2020) ("General concerns about the spread of COVID-19 or the mere fear of contracting an illness in prison are insufficient grounds to establish the extraordinary and compelling reasons necessary to reduce a sentence." (quoting *United States v. Koons*, 455 F. Supp. 3d 285, 292 (W.D. La. 2020))); *United States v. Clark*, 451 F. Supp. 3d 651, 656 (M.D. La. 2020) (finding the defendant had failed to present extraordinary and compelling reasons to modify his prison sentence because he "does not meet any of the criteria set forth by the statute" and he "cites no authority for the proposition that the fear of contracting a communicable disease warrants a sentence modification"). Furthermore, contracting the virus while incarcerated, even in conjunction with preexisting health conditions, is insufficient to establish exceptional and compelling circumstances warranting compassionate release. *See United States v. Jackson*, No. 3:16-CR-196-L-1, 2020 WL 4365633, at *2 (N.D. Tex. July 30, 2020) (finding that defendant had failed to present extraordinary and compelling reasons for compassionate release despite suffering from previous underlying health conditions and testing positive for COVID-19).

Courts have repeatedly denied COVID-19-based motions for compassionate release filed by inmates who have already contracted and recovered from the virus. *See, e.g.*, *United States v. Gipson*, 829 F. App'x 780, 781 (9th Cir. 2020) (affirming denial of compassionate release for a defendant with preexisting conditions who had already contracted COVID); *United States v. Stockman*, No. H-17-116-2, 2020 WL 5269756, at *3 (S.D. Tex. Aug. 26, 2020) (noting that

when an inmate is infected and recovers from COVID-19, the courts have found the risks of infection or severe symptoms or effects because of underlying conditions change and diminish); *United States v. Baker*, No. CR 16-179, 2020 WL 4584195, at *4 (E.D. La. Aug. 10, 2020) ("Courts have denied COVID-19-based motions for compassionate release filed by inmates who have already contracted the virus."); *United States v. Neal*, No. CR 11-28, 2020 WL 4334792, at *1 (E.D. La. July 28, 2020) ("Courts have repeatedly found that defendants who contract COVID-19 and recover are not among those who fall within the guidelines or demonstrate 'extraordinary and compelling reasons,' meriting a reduction in their sentence."); *United States v. Gallegos*, No. 4:17-CR-568, 2020 WL 3403032, at *3 (S.D. Tex. June 19, 2020) ("Having already contracted and fully recovered from COVID-19, the Court cannot say that Defendant's asthma 'substantially diminishes [his] ability . . . to provide self-care within the environment of a correctional facility.'" (quoting U.S.S.G. § 1B1.13)).  Therefore, Mount has failed to establish that a qualifying medical condition or other reasons exist that would constitute extraordinary and compelling reasons to reduce his sentence to time served and place him on home confinement.

The court further finds that compassionate release is not warranted in light of the applicable factors set forth in § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A) (requiring courts to consider the § 3553(a) factors before granting compassionate release); *Thompson*, 2021 WL 37493, at *3 n.11 (collecting cases); *Chambliss*, 948 F.3d at 693-94.  The nature and circumstances of Mount's offense of conviction entail his participation in a drug trafficking conspiracy in which he was responsible for distributing between 5 and 15 kilograms of a mixture or substance containing a detectable amount of methamphetamine or between 500 grams and 1.5 kilograms of methamphetamine (actual), which was imported from Mexico.  Mount supplied coconspirators

13

with kilogram quantities of methamphetamine from various sources for distribution to others in the Eastern and Northern Districts of Texas. Mount also maintained a premises for the purpose of storing and distributing methamphetamine.

Probation notes that Mount's criminal background dates back to the 1980s and "most of the convictions in his criminal history, where he received probation sentences, resulted in revocation because of noncompliance issues." Mount's extensive criminal history includes prior convictions for criminally negligent homicide, driving while intoxicated, possession of marijuana (2), unlawful possession of a controlled substance (cocaine) (2), unlawful possession of a controlled substance (heroin), evading arrest with a vehicle, resisting arrest, unlawful possession with intent to deliver a controlled substance (Gamma-Hydroxybutyrate), and unlawful possession of a controlled substance (methamphetamine). He repeatedly failed to comply with previous terms of probation, as Probation observes, and was on parole at the time of the instant offense. Mount also has a history of poly-substance abuse, including the use of alcohol, marijuana, powder cocaine, crack cocaine, methamphetamine, and various pills. He reported to Probation using up to 3.5 grams of methamphetamine per day from age 18 until his arrest in 2014 at age 46. Further, he has been evaluated as having a "medium risk recidivism level." Hence, the court cannot conclude that Mount would not pose a danger to any other person or to the community, if released from prison at this time.

In addition, granting Mount compassionate release would fail to provide just punishment for his offense and promote respect for the law. In *Chambliss*, the United States Court of Appeals for the Fifth Circuit found that the district court did not abuse its discretion in denying compassionate release to a defendant due to the defendant's not yet having served a significant

portion of his sentence. *Id.* at 694. The district court determined that the defendant's terminal illness "constitut[ed] 'an extraordinary and compelling reason for a sentence reduction' and that he '[did] not present a danger upon release,'" but denied release because "releasing [the defendant] after serving only 14 years of a 30-year sentence minimizes both the impact of [the defendant's] crime and seriousness of the offense." *Id.* at 693-94. "Moreover, the [district] court, citing the § 3553(a) factors, determined that requiring [the defendant] to serve the remainder of his sentence would 'provide just punishment for the offense' and 'afford adequate deterrence to criminal conduct.'" *Id*. In the instant case, Mount has served 6 years of his 15 year, 8 months term of imprisonment. Releasing Mount after he has served only approximately 49% of his sentence would similarly minimize the impact of his crime and the seriousness of his offense.

Mount maintains that the court "must use its power of equity and enforce DOJ directives to the BOP . . . to release inmates, such as [himself], who are most susceptible to this deadly virus, specifically a U.S. citizen . . . " to home confinement. Mount argues that "USAG Barr's directive ORDERS the BOP to release NON-VIOLENT, NO-RISK, vulnerable prisoners," which he contends includes himself. Mount misapprehends the application and construction of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). The CARES Act "expanded the [BOP]'s power to 'place a prisoner in home confinement' under § 3624(c)(2) . . . but reserved the determination of 'suitable candidates' for home confinement to the [BOP]." *United States v. Williams*, 829 F. App'x 138, 139 (7th Cir. 2020) (quoting *Alam*, 960 F.3d at 836)). The CARES ACT states in relevant part*:*

> HOME CONFINEMENT AUTHORITY.—During the covered emergency period, if the Attorney General finds that emergency conditions will materially affect the functioning of the [BOP], the Director of the [BOP] may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home

15

>confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate.

Coronavirus Aid, Relief, And Economic Security Act, Pub. L. No. 116-136, 134, § 12003 Stat. 281, 516 (2020). The CARES Act does not grant the court the authority to make home confinement determinations. "Nor for that matter is any such role envisioned under § 3624(c)(2), which authorizes the [BOP] 'to the extent practicable, [to] place prisoners with lower risk levels and lower needs on home confinement . . . .' As the Supreme Court emphasizes, the [BOP] has 'plenary control' over an inmate's placement." *Williams*, 829 F. App'x at 139 (quoting *Tapia v. United States*, 564 U.S. 319, 331 (2011)).

Hence, the BOP has the exclusive authority to determine where a prisoner is housed; thus, the court is without authority to order home confinement. 18 U.S.C. § 3621(b); *Cheek v. Warden of Fed. Med. Ctr.*, ___F. App'x___, No. 20-10712, 2020 WL 6938364, at *2 (5th Cir. Nov. 24, 2020) (holding that "the pandemic did not create judicial authority to grant home confinement"); *United States v. Donnell*, ___ F. Supp. 3d ___, No. 4:10-CR-65-SDJ-CAN, 2020 WL 5939095, at *7 (E.D. Tex. Aug. 4, 2020); *Ambriz v. United States*, 465 F. Supp. 3d 630, 633 (N.D. Tex. 2020); *United States v. Miller*, No. 2:17-CR-015-D (02), 2020 WL 2514887, at *1 (N.D. Tex. May 15, 2020) ("[N]either the CARES Act nor the First Step Act authorizes the court to release an inmate to home confinement."). Indeed, "[n]o inmate has a constitutional right to be housed in a particular place or any constitutional right to early release." *Cheek*, 2020 WL 6938364, at *3. "It is not for a court to step in and mandate home confinement for prisoners, regardless of an international pandemic." *Id*.

Furthermore, the BOP has instituted a comprehensive management approach that includes screening, testing, appropriate treatment, prevention, education, and infection control measures

in response to COVID-19. In response to a directive from the former United States Attorney General in March 2020, the BOP immediately began reviewing all inmates who have COVID-19 risk factors, as described by the CDC, for the purpose of determining which inmates are suitable for placement on home confinement. *See United States v. Collins*, No. CR 04-50170-04, 2020 WL 1929844, at *3 (W.D. La. Apr. 20, 2020). The BOP notes that inmates need not apply to be considered for home confinement, as this is being done automatically by case management staff. Since March 26, 2020, the BOP has placed 20,288 inmates on home confinement. The March 2020 directive is limited to "eligible at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities." *United States v. Castillo*, No. CR 2:13-852-1, 2020 WL 3000799, at *3 (S.D. Tex. June 2, 2020).

In his Memorandum to the BOP dated March 26, 2020, former Attorney General Barr acknowledges that the Department of Justice ("DOJ") has an obligation to protect both BOP personnel and inmates. He also notes that the DOJ has the responsibility of protecting the public, meaning that "we cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-19 or put the public at risk in other ways." The Attorney General issued a subsequent Memorandum to the BOP on April 3, 2020, in which he emphasizes that police officers protecting the public face an increased risk from COVID-19 and cannot avoid exposure to the virus, with their numbers dwindling as officers who contract the virus become ill or die or need to recover or quarantine to avoid spreading the disease. Accordingly, he cautions:

> The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal

> associates, and that they will not return to their old ways as soon as they walk through the prison gates.

As the court noted in *United States v. Preston*, "[t]he best predictor of how [Defendant] will behave if he were to be released is how he behaved in the past, and his track record is a poor one." No. 3:18-CR-307-K, 2020 WL 1819888, at *4 (N.D. Tex. Apr. 11, 2020) (quoting *United States v. Martin*, 447 F. Supp. 3d 399, 403 (D. Md. 2020)). Here, Mount's track record is similarly a poor one. There is no reason to believe that Mount would not revert to his drug-dealing and drug-abusing activities if released from prison at this juncture.

In short, Mount has failed to satisfy his burden of showing the necessary circumstances to warrant relief under the statutory framework to which the court must adhere. *See United States v. Dodge*, No. 17-323-01, 2020 WL 3668765, at *5 (W.D. La. July 6, 2020) (stressing that "the rampant spread of the coronavirus and the conditions of confinement in jail, alone, are not sufficient grounds to justify a finding of extraordinary and compelling circumstances"); *Koons*, 455 F. Supp. 3d at 291-92 (same). As the court observed in *Koons*, rejecting the notion that it has "carte blanche" authority to release whomever it chooses, "[t]he Court cannot release every prisoner at risk of contracting COVID-19 because the Court would then be obligated to release every prisoner." *Dodge*, 2020 WL 3668765, at *6; *Koons*, 455 F. Supp. 3d at 292.

III.   Conclusion

In accordance with the foregoing analysis, Mount's *pro se* Motion for Sentence Modification (#985) is DENIED.

SIGNED at Beaumont, Texas, this 19th day of January, 2021.

*Marcia A. Crone*

MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE